**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**The School Board for the**
**City of Virginia Beach, VA,**

        **Plaintiff,**

**v.**                                                         **Case No.**

**Cassidy & Michelle Norman,**
**Parents of M.N.,**

        **Defendants.**

**COMPLAINT**

The School Board of the City of Virginia Beach, VA dba Virginia Beach City Public Schools (the "School Division" or "VBCPS"), by counsel, for its complaint against defendants Cassidy & Michelle Norman, parents of M.N., state:

1.      This action is brought under the Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1400 *et. seq.* (2004) and the Regulations Governing Special Education Programs for Children with Disabilities in Virginia, 8 Va. Admin. Code. § 20-81-10 *et. seq.* to appeal the October 30, 2016 decision of the local hearing officer in the due process hearing for student M.N.

2.      This court has jurisdiction under 20 U.S.C. § 1415 (i)(2)(A).

3.      Venue is proper in this court because the School Division is an aggrieved party within the meaning of 20 U.S.C. § 1415 (i)(2)(A) and 28 U.S.C. § 1391.

**Parties**

4.      The School Division operates the public school system within the City of Virginia Beach, VA under the authority granted to it by the Constitution of Virginia, Art. 7, § 7, and is the Local Educational Agency (LEA) charged with providing a Free and Appropriate Public Education (FAPE) to students qualifying for special education and related services under the IDEA.

5.      VBCPS contains eighty-seven total schools including fifty-five elementary schools, fifteen middle schools, twelve high schools, and five specialty centers or secondary post-secondary schools with an approximate enrollment of 69,085 students.

6.      When this dispute arose, the student resided in the City of Virginia Beach, VA with her parents, Cassidy and Michelle Norman.

**Factual Background**

7.      M.N. is a 13-year-old special education student enrolled in Chesapeake Bay Academy (CBA), whose zoned school is Princess Anne Middle School (PAMS) in VBPCS.

8.      M.N.'s disabilities and medical conditions include cerebral palsy/right hemiplegia, other neurodevelopmental disorder, and language disorder, ADHD, developmental coordination disorder, learning disorder, deficits in higher order reading comprehension, written expression, and arithmetic calculation secondary to the global and nonverbal processing deficits identified above, obsessive-compulsive disorder, and generalized anxiety disorder.

9.      M.N. has a walk aid functional electric stimulation system, bilateral cascade chipmunk shoe inserts, Ultraflex night breaks, glasses for nearsightedness, and is prescribed Concerta for ADHD, and Prozac for OCD and anxiety.

10.     In 2005, M.N. was found eligible for special education (SPED) and related services for developmental delay. In 2009, her eligibility designation was changed to Orthopedic Impairment (OI). In 2012, Other Health Impairment (OHI) was added.

11.     During the 2013-2014 school year, M.N. attended Fairfax County Public Schools (FCPS). Her Individualized Education Program (IEP) dated May 5, 2014 included services for learning disability, and related services of adaptive physical education, physical therapy (PT), and occupational therapy (OT). She received small group instruction in reading, writing, and math. The May 2014 IEP listed thirty-one accommodations and modifications for her to be academically and socially successful at school.

2

12.     In September 2014, M.N. enrolled in VBCPS as a 5th grade student at Red Mill Elementary School. That same month, VBCPS conducted the Developmental Reading Assessment (DRA) and Scholastic Reading Inventory (SRI) and found she was reading at a third-grade level. She received 30 on the DRA and 500 on the SRI.

13.     On September 18, 2014, the IEP team met with the parents to review M.N.'s instructional needs and the IEP from FCPS. At that meeting, VBCPS proposed an amended IEP substantially the same as the consented-to FCPS IEP. The parents took the proposed IEP home to review. They informed VBCPS the following day that an additional meeting was needed to address their concerns.

14.     On October 1, 2014, the IEP team reconvened to address the parents' concerns and proposed an amended IEP that incorporated the May 2014 FCPS IEP, but included an additional 35 minutes of resource in lieu of social studies instruction, based on M.N.'s completion of the social studies curriculum and SOL testing at FCPS during the 2013-2014 school year. The proposed IEP also changed OT and PT services to accommodations. Mrs. Norman signed and consented to the October 1 proposed IEP amendment (the "Stay Put IEP"). The Stay Put IEP is the last IEP consented to by M.N.'s parents.

15.     In October 2015, VBCPS conducted physical and occupational therapy assessments of M.N.

16.     On December 8, 2014, an IEP team convened to address the parents request for a 1:1 assistant and updated testing, to include a neuropsychological evaluation and assistive technology evaluation. The Prior Written Notice stated that VBCPS rejected the request for a 1:1 assistant due to insufficient data, rejected Extended School Year (ESY) services, and proposed a follow up meeting to discuss the parents' request for evaluations and developing a new annual IEP. That meeting was held on December 11, 2014.

17.     On December 18, 2014, the parents contacted Dr. Daisy Wood, the director of the Office of Programs for Exception Children (OPEC) to discuss their request for a 1:1 assistant.[1]

18.     The IEP team held several meetings with M.N.'s parents throughout the remainder of the 2014-2015 school year in an effort to develop a new annual IEP, which included meetings on January 20, January 22, February 2, February 5, March 23, March 26, March 30, April 2, June 9, and June 17, 2015.

19.     On January 22, 2015, the IEP team met to discuss a proposed annual IEP to include additional time for reading and written expression. The parents provided partial consent to the proposed IEP, agreeing only to 90 minutes of special education services five times weekly for reading and written expression in the general education classroom.

20.     In March 2015, M.N. received testing from Dr. Jacqueline Cotton and Dr. Amy Newmeyer. Dr. Cotton recommended M.N. receive individual assistance. Dr. Newmeyer recommended M.N. be provided a 1:1 aide. On March 26, 2015, the IEP team met and discussed a thirteen-page document the parents provided regarding the IEP development and the letters from Dr. Cotton and Dr. Newmeyer.

21.     On March 30, 2015, the IEP team met and discussed the parents' request for a 1:1 aide. VBPCS did not agree to the parents' request for a 1:1 aide for M.N. and continued discussing the thirteen-page document.

22.     On April 2, 2015, the IEP team met to continue the discussion of the thirteen-page document.

23.     On April 14, 2015, VBCPS received an email from Mr. Norman requesting several additional changes discussed at prior IEP meetings and again requesting revisions to the proposed IEP. In response to Mr. Norman's email, VBCPS made changes based on mutually agreed upon discussion points that appeared absent from the proposed IEP and corrected typographical errors. It was VBCPS'

---

[1] In January 2015, Mr. Norman again reached out to the Principal of Red Mill Elementary and Dr. Wood to reiterate their position that M.N. required a full-time 1:1 assistant. The IEP team proposed a meeting to discuss these concerns and continue developing an annual IEP, however, M.N.'s parents refused to meet until they were able to speak with Dr. Wood.

understanding that all parent concerns had been addressed: "VBCPS interprets that all issues have been addressed and that IEP has been proposed. The last iteration of the IEP is included with this Prior Written Notice. Should the parents have further points to discuss or have any clarifying questions, VBCPS is willing to arrange another IEP meeting. The proposed IEP cannot be implemented until parent consent is received." (PWN dated 2/05/2015)

24.     On May 7, 2015, M.N.'s parents and VBCPS administrators spoke on the phone to clarify the flexible scheduling accommodation regarding SOL testing. VBCPS determined the multiple test sessions of the 5th grade math SOL test would be taken over three days instead of the recommended two days.

25.     On May 8, 2015, VBCPS sent a new draft IEP and an amended PWN was sent to the parents for review. The parents did not provide consent.

26.     On June 17, 2015, VBCPS again entered into a partial consent IEP to provide Extended School Year (ESY) services to M.N. during for the summer of 2015. The parents otherwise did not provide consent to the proposed IEP.

27.     M.N.'s reevaluation meeting was held on August 3, 2015 and additional assessments were proposed.

28.     In the fall of 2015, VBCPS promoted M.N. to the 6th grade.

29.     On August 10, 2015, the parents notified VBPCS of their intent to place M.N. at CBA at public expense for the 2015-2016 school year.

30.     CBA recommended M.N. repeat the 5th grade rather than be promoted to the 6th grade.

31.     The IEP team continued to meet to draft an annual IEP for M.N. The IEP team met on October 15, 2015, December 4, 2015, January 20, 2015, February 2, 2016, and June 9, 2016.

32.     On August 25, 2015, the IEP team convened to discuss a proposed IEP for M.N.'s placement at PAMS. VBCPS used data from VBCPS reports, including the neuropsychological and assistive technology reports, and a letter from Cincinnati Children's Hospital provided from the parents. VBCPS and the parents provided input to the IEP team.

33.     On October 15, 2015, the Special Education Committee (SEC) convened and proposed M.N.'s eligibility for special education as a student with Other Health Impairment (primary) and Orthopedic Impairment (secondary) under the IDEA. The SEC reviewed the speech observation, OT evaluation, PT evaluation, and VBCPS' neuropsychological evaluation.

34.     On December 4, 2015, the IEP team met to continue working on the annual IEP dated January 22, 2015.

      a.     VBCPS asserted the data supported no speech and language evaluation, but to compromise with the parents, VBCPS proposed a speech and language assessment and an auditory processing evaluation.

      b.     The IEP team reviewed all information from the student's cumulative record, IEP, progress reports, IEEs (OT, PT, neuropsychological, and CBA educational) with input from VBCPS and the parents.

      c.     VBCPS considered the parents' request for direct OT and PT services and determined M.N. could access special education services with the accommodations in the proposed IEP; therefore, VBCPS rejected the parents' request.

33.     On January 20, 2016, the parents submitted a neuropsychological evaluation from Dr. William Ling dated December 4, 2015.

35.     That same day, the IEP team convened to continue drafting M.N.'s proposed annual IEP; M.N.'s parents, however, could not attend. The team continued considering the recommendations from Dr. Ling.

36.     On February 2, 2016, the IEP team met with M.N.'s parents and discussed the thirty-one recommendations in Dr. William Ling's December 4, 2015 neuropsychological evaluation.

37.     During the February 2, 2016 meeting, the IEP team also considered all other concerns raised by the parents, including:

a.      VBCPS considered the parents' request for compensatory educational services for the denial of FAPE since 2014. VBCPS asserted there has been no denial of FAPE and therefore rejected this request.

b.      VBCPS rejected the parents' request for placement at CBA because M.N. made significant progress on her IEP goals, including mastery of most goals; the data did not support the need to retain M.N. for 5th grade, and the data did not support the need for a more restrictive environment.

c.      VBCPS considered and rejected the parents' request for reimbursement for tutoring and social skills programs from 2014-present because during the 2014-2015 school year. M.N. participated in Helping Hands, in monthly lessons with a guidance counselor, "Lunch Bunch," which is a program for all 5th grade students, is run by a school counselor mastered her social skills goal, and her present level of performance indicated no needs socially in the school environment. After-school SOL tutoring was available for students recommended by their teachers. M.N. was recommended, but she did not attend. She also received an additional 35 minutes daily to work on reading, writing, and math skills in the special education class. Dr. Joey Phillips, assistant principal of PAMS, discussed a military grant program, which provided tutoring and other supports for PAMS students who are military dependents. M.N. would have access to these supports while attending PAMS.

d.      VBCPS considered and rejected the parents' request for tuition reimbursement for M.N. placement's at CBA for the 2015-2016 school year. In August 2015, VBCPS had considered the parents' request for placing M.N. at CBA and had stated VBCPS would not accept responsibility for tuition reimbursement of tuition if the parents' unilaterally placed M.N. at CBA.

e.      The parents again requested CBA for M.N.'s placement. VBCPS considered and rejected this request because VBCPS could provide FAPE.

f.      VBCPS asserted the annual IEP was based on M.N.'s needs as outlined in her present level of academic achievement and functional performance. VBCPS proposed special education related services.

g.      VBCPS did not believe the collected data supported an assistive technology evaluation or auditory processing evaluation, but as a compromise with the parents, VBCPS agreed to conduct an assistive technology evaluation and auditory processing evaluation.

h.      VBCPS rejected the parent's request for private day placement based on M.N.'s significant progress on her IEP goals, including mastery of most goals; the data does not support the need to retain M.N. for the fifth grade; and the data does not support the need for a more restrictive environment.

38.      On June 9, 2016, the IEP team met to continue drafting M.N.'s proposed annual IEP.

a.      The IEP team reviewed all information from the student's cumulative record, IEP, progress reports, IEEs (OT, PT, neuropsychological, CBA educational, speech and language evaluations from Meghan Francis and Cathi Laderberg, VBCPS' January 2016 speech and language evaluation, Dr. Ling's December 4, 2015 report, VBCPS assistive technology evaluation, and VBCPS auditory processing evaluation) with input from VBCPS and the parents used to make all decisions.

b.      VBCPS considered and rejected the parents' request for a social skills goal because M.N mastered her previous social skills goals and did not demonstrate a need.

c.      David Decant, a VBCPS assistive technology specialist, reviewed his evaluation. At the mother's request, the report was amended to include the number of erasures, specifically "name Google docs voice talking versus internet based" and included sample sentences completed using Dragon and Google Docs voice talking. An accommodation of "access to speech to text application" was added to the IEP. In response to concerns raised about the duration of time that M.N. could sustain voice to text before becoming fatigued, the IEP team added an accommodation of extended time.

d.      Monica Cullen, a VBCPS audiologist, reviewed her evaluation. She also reviewed the recommendations made by Meghan Francis and Cathi Laderberg. Ms. Cullen observed that when fatigued, M.N. would perseverate to compensate when processing information. Ms. Cullen recommended no revisions to the IEP because the services and accommodations would address any areas of need regarding auditory processing. Mrs. Cullen stated that auditory processing is worked on regularly

8

in the classroom and there is not a specific goal to address improving auditory processing. Ms. Cullen shared some strategies that would be beneficial to M.N. Dr. Phillips shared those recommendations could be considered when placing her with a team of teachers. VBCPS clarified that M.N.'s auditory processing weaknesses would not negatively affect her read aloud accommodation.

e.      Michelle Galvin, a VBCPS speech pathologist, also reviewed the speech and language IEE from Ms. Francis and Ms. Laderberg. The IEP team discussed the merit of administered tests (CELF-4). Ms. Galvin administered the CELF-5, an assessment that updated language core tests. Ms. Galvin explained that classroom performance is a better indicator regarding speech and language skills.

39.     On June 23, 2016, VBCPS sent the parents a Prior Written Notice (PWN) with a proposed IEP.

40.     On July 7, 2016, the IEP team sent a revised PWN and proposed IEP to the parents.

41.     On July 11, 2016, the parents signed the proposed IEP in disagreement. This IEP was a culmination of sixteen meetings over dozens of hours, not including individual assessments and observations of M.N.

**Local Due Process Hearing**

42.     On July 11, 2016, the parents initiated a due process hearing against VBCPS alleging violations of the IDEA for issues regarding placement and failure to provide FAPE through an appropriate IEP.

43.     On September 12-14, 2016, hearing officer Rhonda J. Mitchell, Esq. heard the due process case.

44.     On October 30, 2016, the hearing officer decided.

45.     All administrative remedies have been exhausted and the School Board must file the administrative record with this Court.

**Hearing Officer's Findings of Fact**

46.     The hearing officer identified four issues in her prehearing report:

a.    Whether or not the local education agency (LEA) has properly implemented an IEP for the student.

b.    Whether or not the LEA is providing the student with a free and appropriate public education (FAPE).

c.    Whether or not the LEA provided enough educational evaluations to formulate an appropriate IEP within a reasonable time.

d.    Whether or not private day placement is required for the student to receive a FAPE.

e.    The hearing officer listed her factual findings for all four issues presented.

47.    **Issue 1: Did the School Division properly implement an IEP for M.N.?**

a.    The hearing officer found that on August 11, 2014, VBCPS accepted the FCPS IEP for implementation. The Prior Written Notice for Transfer Placement prepared by VBCPS accepted the FCPS IEP as compliant with regulations governing programs for children with disabilities in Virginia. The acceptance document states that the IEP placement could be transferred and "*implemented* by VBCPS.

b.    The hearing officer recounted the parents' testimony regarding VBCPS' allegedly inconsistent implementation of M.N.'s accommodations. She stated a failure to provide these IEP accommodations "is very troubling and presents procedural violations."

c.    The hearing officer stated that M.N.'s test results showed her academic regression. The hearing officer found M.N. was reading on a third grade level.

d.    The hearing officers found the IEP meetings were often "contentious," and noted the parents' feelings they were not being heard by school officials.

e.    The hearing officer found VBCPS failed to provide M.N. with stay put protections by failing to implement components of the FCPS IEP. This failure compromised M.N.'s ability to receive FAPE. The hearing officer found Ms. Norman's testimony about M.N.'s frustration with homework credible given M.N.'s "overall test results."

      f.     The hearing officer found VBCPS made "sincere efforts to work with the parents and to educate [M.N.], but determined this "'good will' effort does not excuse VBCPS' failure to implement the [FCPS IEP] that resulted in academic and social harm to M.N." The hearing officer found that VBCPS did not appropriately implement the FCPS IEP, and that the parents met their burden of proof.

    48.    **Issue 2: Did the School Division provide M.N. with FAPE?**

      a.     The hearing officer observed, "[a]lthough VBCPS was under no obligation to provide M.N. with *maximum* educational benefit, both the IDEA and Virginia law require more than just *minimal* educational benefit to a disabled child." She found M.N. is a severely disabled child in need of "extensive and comprehensive" educational services, and accommodations "if she is to receive more than just a *minimum* educational benefit."

      b.     The hearing officer observed M.N.'s "multiple disabilities require 'hands-on' adult direction, guidance, and assistance throughout the school day with few or limited distractions." VBCPS offered inclusion classes with individualized adult assistance and specialized instruction to educate M.N. in the least restrictive environment. VBCPS also offered a multisensory approach to education, addressing each of her individual needs through varying educational approaches. The parents testified that they did not believe their concerns were taken seriously and that they had lost confidence and trust in VBCPS.

      c.     The hearing officer stated that "[w]ith an appropriate IEP in place, [M.N.]'s educational and academic goals might have been identified, and special education and related services could have been tailored to help [M. N.] reach her educational and transitional goals. Her strengths and weaknesses could have been addressed in an IEP, and she would have been tracked and received personalized instruction," but "this did not occur."

      d.     The hearing officer defined the term "Stay Put IEP" as the May 2014 FCPS IEP. Using the FCPS IEP as the standard, the hearing officer found the School Division's implementation of instruction and services to M.N. did "not comport with her IEP." The hearing officer stated, VBCPS

"should not implement unilateral changes to an IEP without parental consent." The hearing officer found VBCPS moved OT and PT from the service category to accommodations without reference to a meeting or document.

      e.    The hearing officer focused on M.N.'s SOL tests and quarterly math and language assessments as measures of her academic regression. CBA recommended M.N. repeat the fifth grade after conducting assessments. The hearing officer found these scores "represent[ed] an academic regression or at best, a stagnation. She rejected M.N.'s passing grades and promotion to sixth grade as evidence of "sufficient educational benefit." She further noted M.N.'s Developmental Reading Assessment (DRA) score dropped from 38 (Spring 2014) to 30 (Fall 2014) and rose to 34 (Winter 2015). From these scores, the hearing officer determined M.N. performed below grade level and should have received specialized instruction by VBCPS to "close that gap." The hearing officer concluded VBCPS did not "close that gap," and found M.N. "was denied the educational benefits to which she was entitled under the IDEA." In addition, she found VBCPS' last proposed IEP failed to meet M.N.'s "complex academic and functional needs by rejecting parental concerns minimizing the severity of [M.N.]'s disabilities," conducted a "cursory review" of the IEEs, and failed to include "agreed upon revisions to the IEP drafts."

    49.    **Issue 3: Did the School Division provide M.N. with enough educational evaluations to formulate and IEP within a reasonable time?**

      a.    The hearing officer noted that on December 8, 2014, the parents requested updated testing, including neuropsychological and assistive technology evaluations. On January 7, 2015, VBCPS conducted an informal PT assessment for M.N. and on January 13, 2015, VBCPS conducted an informal OT assessment. On January 26, 2016, VBCPS conducted a neuropsychological evaluation. On February 6, 2015, VBCPS conducted an assistive technology communication assessment. On August 3, 2015, VBPCS agreed to conduct "formal" OT and PT assessments. On January 11, 2016, VBCPS conducted the speech language evaluation.

b.      The hearing officer found VBCPS conducted numerous evaluations after M.N.'s eligibility determination. She determined VBCPS was not obligated to agree with every one of the parents' evaluation requests. VBCPS acted "reasonably fast to complete the testing, particularly considering the school district's very large student population.

c.      VBCPS provided sufficient educational evaluations to formulate an appropriate IEP within a reasonable time. Unfortunately, the results of these evaluations and assessments could not be integrated into a workable IEP. Despite this unfortunate result, once the parents paid for independent evaluations, they assumed the risk that they would not be reimbursed. The parents will not be reimbursed for the independent evaluations.

d.      There will be no reimbursement for tutoring or social skills training. The parents did not meet their burden on this issue, therefore relief is denied.

50.      **Issue 4: Is M.N.'s placement at CBA required for her to receive FAPE?**

a.      The hearing officer found M.N. did not receive FAPE at VBCPS. The parents unilaterally placed M.N. at CBA with timely notice to VBCPS. The hearing officer found CBA is a state certified private day school that specializes in educating disabled children. Approximately 100 students attend CBA; class size ranges from three to eight students.

b.      The hearing officer recounted that the parents testified CBA's small classrooms and overall flexible educational structure inherently accommodates M.N.'s complex processing and cognitive deficits, neurological and physical disabilities. The parents contended M.N. is progressing educationally and socially at CBA. The parents alleged that the smaller classrooms, smaller facility, and smaller class sizes provide the flexibility and individualized attention required for M.N. to receive educational benefit and FAPE.

c.      The hearing officer found that although knowledgeable in his field and clearly well intended, Dr. Phillips relied on the information, proposed IEP, and data he received from Red Mill Elementary. For example, Dr. Phillips testified that from the documents and data he received, M.N. could communicate and be heard in the classroom. The hearing officer found from her personal observation of

M.N.; that she likely could not be heard in a classroom full of students without a direct intervention or accommodation each time she spoke.

      d.     The hearing officer observed M.N.'s voice projection was very low, her speech was intelligibly reduced, and she could barely be heard when speaking.

      e.     The hearing officer noted that CBA has adopted a class rule that requires everyone to be quiet while M.N. speaks so she can be heard. It is important for a student to be heard. With 1,470 students at PAMS, M.N.'s inability to be heard could pose a safety problem for her in moments of distress.

      f.     The hearing officer noted that CBA re-tested M.N. in May of 2016 to measure her progress while a student at CBA during school year 2015-2016. The hearing officer found M.N.'s grade equivalency scores from CBA showed considerable across-the-board improvements. The hearing officer found no evidence to support a claim that CBA's scores were skewed; she found these scores indicate that CBA has, and can, offer M.N. meaningful educational benefit as opposed to "minimum or nominal educational benefit." The hearing officer found CBA could provide FAPE to M.N.

      g.     The hearing officer found CBA could provide the services that M.N. requires and the flexibility to rearrange her scheduling and programs as she progresses. She found CBA addressed M.N.'s full array of disabilities through the direct services provided at CBA. The small classroom and small school size provide M.N. the individualized attention she requires to receive educational benefit.

      h.     The hearing officer found VBCPS denied FAPE to M.N. because the Stay Put IEP was violated, progress reports were not provided without prompting, the IEP team could not reach agreement after sixteen meetings the final proposed IEP from VBCPS could not meet M.N.'s complex needs, the data used for her IEP at PAMS is disputed, IEEs were only given a cursory review, all accommodations were not implemented from the Stay Put IEP, and M.N. was regressing both educationally and socially. The hearing officer was "not convinced" M.N. would receive FAPE at PAMS. Testimony from M.N.'s doctors, including the evaluations from Dr. Ling and Dr. Lucker, clearly indicate that M.N. needs continuous specialized and individual attention in a smaller environment to receive

educational benefit. Princess Anne Middle School with its 1,470 student population would not educationally benefit M.N. regardless of how well VBCPS intended may be. In her case, with her multiple neurological, mental, processing, cognitive and physical disabilities, at this stage in her life, M.N. requires the small school environment offered at CBA to effectively learn both academically and socially. The hearing officer admonished CBA to educate M.N. towards independence with the "ultimate goal" of returning her to public school. With no medical or cognitive setbacks, the hearing officer opined, "M.N. should be more mature and more prepared to handle the rigors of [VBCPS]."

        i.       The hearing officer stated M.N.'s placement must be determined based on her individual disabilities and complex needs. She found that the educational benefits available to M.N. in a traditional, inclusive or special education classroom at PAMS even if supplemented with appropriate aids and services, compared to the educational benefits she will receive from CBA, were "negligible."

        j.       The hearing officer found M.N. would receive educational benefit from continued attendance at CBA. CBA's Individualized Instruction Plans (IIPs) were ordered be used as a guide to educate M.N. as is their practice and serve as a substitute for any VBCPS generated IEP. CBA must provide VBCPS with M.N.'s quarterly progress reports.

### Errors of Hearing Officer

### Count 1
### (Due Deference to Professional Educators)

51.      The School Division re-alleges statements contained in paragraphs 1-49 of this Complaint.

52.      The hearing officer was required to give due deference to professional educators who best know the child and not "second guess" the judgment of educational professionals.

53.      The hearing officer noted, local educators should be "given deference" and "afforded latitude when determining the IEP most appropriate for a disabled child," but she did not show such deference to VBCPS educators when stating,

       a.      "With an appropriate IEP in place, [M.N.]'s educational and academic goals might have been identified and appropriate special education and related services could have been tailored to help [M.N.] reach her educational and transitional goals."

       b.      M.N.'s "strengths and weaknesses could have been addressed in an IEP, and she would have been tracked accordingly and received personalized instruction. Unfortunately, this did not occur."

       c.      "In this case, parental concerns seemingly went unheard by the educators regardless of evaluation reports that presented the same concerns; all while [M.N.] continued to academically regress."

       d.      M.N.'s final grades for the 2014-2015 school year that passed her to the sixth grade as an honor roll student are suspect and could not have been an accurate reflection of her progress since she received a 'fail' on her SOLs in mathematics, English, reading and science, in conjunction with failing her quarterly math and language assessments."

       e.      The "'stay-put' IEP" was not followed….the instruction and services provided [M.N.] by VBCPS did not comport with her IEP."

       f.      "The LEA should not implement unilateral changes to an IEP without parental consent."

       g.      "The IEPs proposed by VBCPS dropped eight goals and sixteen accommodations that the parents contend [M.N.] continued to need."

       h.      The "IEP moved occupational therapy and physical therapy from the services category to accommodations….VBCPS justified the OT and PT changes by claiming that is the way it is routinely done in VBCPS."

       i.      "Ms. Deanne Vasely, an occupational therapist for VBCPS, testified that she performed a functional baseline assessment on [M.N.] between September 2014, when [M.N.] returned to the VBCPS, and January 2015. Her assessment included a summarization of Marisa's strengths and

difficulties. She stated that through her observations, she looked for ways to make Marisa a wholly functional and independent person. She made several recommendations towards this end."

j.      "Despite receiving passing grades from VBCPS, M.N. failed all of her Standards of Learning tests and quarterly math and language assessments."

k.      "[A]s as a sign of academic regression, when [M.N.] was tested by CBA, they recommended that she repeat the fifth grade. These [CBA] scores represent an academic regression or at best, a stagnation. These scores represent problems and should have red flagged a need for immediate intervention."

l.      "Even if VBCPS' assertion that [M.N.] should be promoted to the sixth grade is believed, the mere fact that M.N. received grades sufficient for promotion does not in and of itself mean that [M.N.] received a FAPE."

m.      "I reject VBCPS' argument that [M.N.] received sufficient educational benefit and find regression despite her receipt of passing grades from VBCPS."

n.      "At best, this hearing officer has concluded that [M.N.] received only minimum educational benefit while attending Red Mill Elementary."

o.      "If a child, such as [M.N.], is performing below grade level, that child needs to receive specialized instruction. It is the responsibility of the IEP team to develop annual goals to close the gap. This did not occur."

p.      "[M.N.] was denied the educational benefits to which she was entitled pursuant to IDEA."

q.      "[M.N.] was denied full use of the FCPS IEP as a 'stay-put' mechanism with no other IEP having been put in place."

r.      "[M.N.] was provided only *minimum* educational benefit by virtue of the accommodations she received and was therefore denied a FAPE. IEPs should include academic and functional goals designed to meet the child's needs."

s.  "VBCPS' last proposed IEP failed to meet [M.N.]'s complex academic and functional needs by rejecting parental concerns, minimizing the severity of [M.N.]'s disabilities, providing only cursory review of the results of independent evaluations; and by failing to include agreed-upon revisions to the IEP drafts."

54.  The hearing officer substituted her judgment for that of the IEP team when determining M.N. received only a minimum educational benefit from the accommodations in the Stay Put IEP.

### Count II
### (Factual Findings Not Supported by the Evidence)

55.  The School Division re-alleges statements contained in paragraphs 1-54 of this Complaint.

56.  The hearing officer made factual findings not supported by the evidence, which are thus not entitled to deference:

a.  M.N.'s mother testified that some of M.N.'s IEP accommodations were not consistently implemented or were "unilaterally removed" without notifying her. The evidence showed that VBCPS implemented the accommodations were implemented and none were "unilaterally removed" without parental consent.

b.  M.N.'s father testified that "[M.N.]'s teachers admitted during an IEP meeting that some of the IEP accommodations were not being implemented. This failure to implement any portion of an IEP is a serious infraction, whether the failure is mistaken or not." This testimony was contradicted by the testimony of VBCPS personnel.

c.  "Test results show [M.N.]'s regression. Although a fifth grader, [M.N.] was reading on a third grade level." This finding is not supported by the totality of the evidence.

d.  "IEP team meetings resulted in an impasse because the parents disagreed with the IEPs that were proposed by VBCPS, and, VBCPS would not include many of the provisions that were proposed by the parents." Over sixteen IEP team meetings, VBCPS considered all of the parents' requests and compromised by offering a number of IEEs.

e. "[VBCPS]'s lack of support and assistance caused [M.N.] to avoid going to the bathroom during school to prevent missing time in the classroom and contributed to her academic regression." The parents presented no evidence apart from their own testimony.

f. "The FCPS IEP remains the 'stay-put' IEP in this case." The October 1 Stay Put IEP was the last IEP to which the parents provided consent; it is the Stay Put IEP.

g. "During the IEP meetings, the parents testified that they felt as though they were not being heard by school officials and that [M.N.]'s numerous disabilities were being minimized." VBCPS personnel participated in sixteen separate IEP team meetings over twenty-eight hours, not including IEE observations and assessments. Every concern brought to the IEP team's attention was considered, including all thirty-one recommendations in Dr. Ling's December 4, 2015 report.

h. VBCPS' "'good will effort'" does not excuse VBCPS' failure to wholly implement the 'stay-put' IEP that resulted in academic and social harm to [M.N.]" The evidence shows VBCPS properly implemented the Stay Put IEP. Similarly, the evidence does not show that implementation of the Stay Put IEP "resulted in academic and social harm to [M.N.]"

i. "With an appropriate IEP in place, [M.N.]'s educational and academic goals might have been identified and appropriate special education and related services could have been tailored to help [M.N.] reach her educational and transitional goals." The parents did not challenge the educational and academic goals in the Stay Put IEP, and the IEP team met sixteen times to draft a proposed annual IEP for M.N.

j. "[P]arental concerns seemingly went unheard by the educators regardless of evaluation reports that presented the same concerns; all while [M.N.] continued to academically regress." All parental concerns were brought to the IEP team's attention for consideration, and VBCPS agreed to parental requests for additional IEEs and accommodations even though such requests lacked sufficient supporting data.

k.      The "instruction and services provided [M.N.] by VBCPS did not comport with her IEP." The evidence shows VBCPS provided the instruction and services set forth in the Stay Put IEP and continued drafting a proposed annual IEP in response to parental concerns.

l.      The "IEP moved occupational therapy and physical therapy from the services category to accommodations….VBCPS justified the OT and PT changes by claiming that is the way it is routinely done in VBCPS." The OT and PT changes were implemented in the FCPS IEP, not by VBCPS.

m.      M.N.'s "scores represent an academic regression or at best, a stagnation." In selectively referencing M.N.'s fifth grade SOL scores and CBA testing scores, she overlooks the body of evidence showing M.N.'s academic progress toward her identified IEP goals.

n.      "[T]he mere fact that [M.N.] received grades sufficient for promotion does not in and of itself mean that [M.N.] received a FAPE." Conversely, the fact that M.N. failed some of her SOLs does not signify she did not receive FAPE. The evidence shows M.N. received FAPE as a VBCPS student.

o.      "VBCPS' last proposed IEP failed to meet [M.N.]'s complex academic and functional needs by rejecting parental concerns, minimizing the severity of Marisa's disabilities, providing only cursory review of the results of independent evaluations; and by failing to include agreed-upon revisions to the IEP drafts." The evidence overwhelmingly shows VBCPS supported M.N.'s needs and carefully considered the recommendations presented in IEEs. In addition, VBCPS made all corrections to IEP drafts.

p.      "In the case of [M.N.], it has already been determined that she did not receive FAPE while attending VBCPS." This finding is not supported by the totality of the evidence presented at the administrative hearing.

q.      "Most importantly, with 1,470 students at [PAMS], [M.N.]'s inability to be heard could pose a safety problem for her in moments of distress." No evidence was presented regarding M.N.'s inability to be heard in moments of distress. Nor was there any evidence suggesting the size of PAMS' student population related to M.N.'s safety.

r.     M.N.'s testing scores from CBA "indicate that CBA has, and can, offer [M.N.] meaningful educational benefit as opposed to minimum or nominal educational benefit." There was no evidence presented to justify that CBA's internal tests alone could quantitatively show M.N.'s educational progress.

s.     The "hearing officer is not convinced that Marisa would receive FAPE at [PAMS]." M.N. never attended PAMS due to her unilaterally placement at CBA. As such, the hearing officer's attempt to forecast M.N.'s receipt of FAPE at PAMS lacks factual support.

t.     "[T]he educational benefits available to M.N. in a traditional, inclusive or special education classroom at PAMS, even if supplemented with appropriate aids and services, in comparison to the educational benefits she will receive from CBA, are negligible." The hearing officer's finding is contradicted by the overwhelming amount of contradictory evidence presented at the administrative hearing. In addition, there was insufficient evidence presented about CBA's provision of specialized instruction to M.N. to form an appropriate basis for comparison to the services and accommodations in VBCPS' proposed IEP. Therefore, it was inappropriate for the hearing officer to conclude that CBA could provide FAPE and VBCPS could not.

## Conclusion

For these reasons, the School Division, by counsel, requests this Court to sustain its request for relief, enter judgment for the School Division, award the School Division its legal costs in this proceeding, and other appropriate relief.

Respectfully submitted,


THE SCHOOL BOARD FOR THE
CITY OF VIRGINIA BEACH, VA



_____/s/_____
Kamala H. Lannetti (VSB No. 31726)
Deputy City Attorney
E: klannett@vbgov.com
Dannielle Hall-McIvor (VSB No. 74098)
E: dcmcivor@vbgov.com
Associate City Attorney
OFFICE OF THE CITY ATTORNEY
2512 George Mason Dr.
Virginia Beach, VA 23456
T: 757.263.1210
*Counsel for the School Division*

22